**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TIAHISIA BRYANT, | ) | CASE NO. 1:20-CV-1394 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |
| | ) | |

Plaintiff, Tiahisia Bryant ("Plaintiff" or "Bryant"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further consideration consistent with this opinion.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

On January 30, 2018, Bryant filed an application for POD, DIB, and SSI alleging a disability onset date of April 8, 2017,[2] and claiming she was disabled due to vertigo, neck problems and migraines.  (Transcript ("Tr.") at 218, 267.)  The applications were denied initially and upon reconsideration, and Bryant requested a hearing before an administrative law judge ("ALJ").  (Tr. 169-70.)  On July 12, 2019, an ALJ held a hearing, during which Bryant, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 33-78.)  On July 23, 2019, the ALJ issued a written decision finding Bryant was not disabled.  (*Id.* at 12-32.)  The ALJ's decision became final on May 5, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On June 25, 2020, Bryant filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 12.) Bryant asserts the following assignments of error:

> (1)     The ALJ erred in finding Plaintiff retained the Residual Functional Capacity
>          to perform work activity without proper consideration of her symptoms and
>          resulting exertional and nonexertional limitations.

(Doc. No. 11 at 1.)

## II.  EVIDENCE

### A.     Personal and Vocational Evidence

Bryant was born in 1972 and was 37 years-old on her alleged disability onset date, making her a "younger" individual under social security regulations at all relevant times.  (Tr. 24.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education and is able to communicate

---

[2]     At the July 12, 2019 hearing, Bryant, acting through her counsel, amended her
        onset date to December 1, 2017.  (Tr. 39, 249.)

in English.  (*Id.*)  She has past relevant work as an electronics inspector and a hand packager/inspector.  (Tr. 267.)

**B.    Relevant Medical Evidence[3]**

**1.    Mental Impairments**

On July 19, 2018, State agency consulting psychologist Herschel Pickholtz, Ed..D. evaluated Bryant. (Tr. 484-92.) She reported that vertigo, neck pain and daily migraines prevented her from working. (*Id.* at 485.)  Dr. Pickholtz observed Bryant walked like she was dizzy or off balance, she was obese, and she appeared a bit sluggish and slow.  (*Id.* at 485, 487.)  Her speech was a bit slow, her affect was somewhat restricted, and her mood was slightly depressed. (*Id.* at 488.) She reported an increase in depression over the last four months and mild to moderate levels of anxiety, and she appeared anxious during the cognitive section of the examination. (*Id.* at 488-89.)  Dr. Pickholtz noted Bryant's symptoms were consistent with an avoidant personality disorder and an unspecified depressive disorder but opined she had no mental functional limitations.  (*Id.* at 490-91.)

On October 4, 2018, Bryant saw Rajeet Shrestha, M.D., for a psychiatric evaluation following a referral by primary care physician Scott Yasinow, M.D.  (*Id.* at 631-636.)  Dr. Shrestha noted it was difficult for her to talk about how the stress of her multiple medical conditions was affecting her.  (*Id.* at 632.) She reported that she did not like to be around a lot of people, was sensitivity to loud noises, had crying spells, was sleeping poorly, had low energy, had difficulty focusing and felt hopeless. (*Id.*)  She also reported constant worry and racing thoughts. (*Id.*)  Although she had seen a counselor for after being sexually abused at a younger age, Bryant did not

---

[3]    The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

have flashbacks or nightmares, but did not like being in the dark and felt more closed off.  (*Id.*)  She reported increased depression over the past year with some past suicidal ideation.  (*Id.*)  Mental status examination findings included well-groomed appearance; good hygiene; cooperative and pleasant attitude; normal gait and speech; "stressed" mood; affect that was congruent to her mood, and tearful at times; goal-directed, linear and organized thought process; intact recent and remote memory; and fair insight and judgment. (*Id.* at 635.)  Dr. Shrestha noted Bryant had factors that predisposed her to experiencing a somatic symptom disorder but did not rule out an underlying cause for her physical symptoms.  (*Id.*)  Dr. Shrestha stated "her anxiety and depressive symptoms are certainly having an impact on her quality of life and can influence the prognosis of her medical treatment." (*Id.*)   He diagnosed Bryant with major depressive disorder and generalized anxiety disorder, prescribed her Cymbalta and referred her for psychotherapy. (*Id.*)

On October 19, 2018, Bryant began counseling sessions with Michelle McClure, L.I.S.W. (*Id.* at 515-19.)  She presented with an anxious affect, well-groomed appearance, friendly attitude, good eye contact and normal speech.  (*Id.* at 516.)  She expressed frustration at not being able to work due to her physical health conditions, and wanted to work toward being more outgoing and engaged with others.  (*Id.* at 519.)

On October 30, 2018, Bryant reported her anxiety symptoms were mostly managed because she usually just stayed at home and avoided anxiety triggers.  (*Id.* at 523.)  She explained she mostly sits at home, because physical activities triggered vertigo.  (*Id.*)  Ms. McClure recommended she participate in either the Signature Health Day Group or Magnolia Clubhouse programs.  (*Id.*)

On December 5, 2018, Ms. McClure attempted Eye Movement Desensitization and Reprocessing ("EMDR") therapy to help Bryant process her trauma experience and suppressed

4

emotions, but Bryant was not able to progress and it was discontinued.  (*Id.* at 619.)  Ms. McClure engaged Bryant in relaxation exercises and discussed coping strategies as an alternate therapeutic approach. (*Id.*)

On December 13, 2018, Bryant returned for a follow-up visit with Dr. Shrestha. (*Id.* at 627-30.) She reported being "ok," but felt Cymbalta was making her "non-emotional," although she had also experienced this prior to starting medication.  (*Id.* at 627.) She was still experiencing poor sleep at night and napping during the day, and nortriptyline was no longer helpful.  (*Id.*) Her dizziness had not improved.  (*Id.*) Dr. Shreshta added major depressive disorder, recurrent, to Bryant's diagnoses. (*Id.* at 630.)  He noted her mood had improved slightly but she did not want to increasing her dosage of Cymbalta due to emotional blunting, but planned to continue therapy. (*Id.*)

On January 9, 2019, Bryant met with Ms. McClure, who noted her anxious presentation, as well as her well-groomed appearance, friendly attitude, good eye contact and normal speech.  (*Id.* at 621.)  Bryant reported "she is still struggling with managing anxiety," and was working with doctors to address her vertigo, migraines and neck pain.  (*Id.* at 625.)  She expressed frustration with the limitations imposed by her physical symptoms, and Ms. McClure recommended activities she was able to engage in, such as short trips to museums. (*Id.*)

On January 30, 2019, Ms. McClure again noted Bryant's anxious mood, as well as her well-groomed appearance, friendly attitude, good eye contact and normal speech.  (*Id.* at 641.)  Bryant expressed frustration at the minimal progress toward treatment of her physical symptoms, and Ms. McClure led her in relaxation exercises, and successfully initiated EMDR therapy.  (*Id.* at 644-45.)

On February 13, 2019,  Ms. McClure noted Bryant's appropriate affect, well-groomed appearance, friendly attitude, good eye contact and normal speech.  (*Id.* at 647.)  Bryant reported

5

increased feelings of anxiety regarding her upcoming surgery, which she was able to manage with breathing exercises led by Ms. McClure. (*Id.* at 650.) She also continued EMDR therapy.  (*Id.*)

On April 4, 2019, Bryant returned to Dr. Shreshta for treatment of her anxiety and depression. (*Id.* at 741-44.)  Bryant reported her mood was "up and down," varied day to day based on what was going on around her but she regularly had trouble falling asleep and did "not chance to go anywhere." (*Id.* at 741.)  Dr. Shrethsa noted Bryant had a lot of stressors, including a recent surgery which caused her to miss some therapy sessions.  (*Id.*)  She reported feelings of worthlessness due to not being able to work, and occasionally felt like she "does not want to be here," but denied suicidal thoughts and reported her daughter was her protective factor.  (*Id.*)  Dr. Shrestha observed she was well groomed; had good hygiene; cooperative and pleasant demeanor; normal gait and speech; affect congruent to her mood; goal-directed, linear, and organized thought process; fair insight and judgment; and intact concentration.  (*Id.* at 744.)  He increased Bryant's dosage of Cymbalta due to ongoing mood instability. (*Id.*)

### 2.      Physical Impairments

On April 25, 2017, Bryant sought treatment from Darrell Smith, M.D., for increased dizziness, feeling off balance when she walked and blurred vision. (*Id.* at 373-74, 394-407.)  She was diagnosed with vertigo, started on Antivert, and referred to an otolaryngologist. (*Id.* at 396, 398-99.)  Dr. Smith noted that Bryant's symptoms and examination findings were consistent with benign paroxysmal vertigo, and performed an Epley's particle repositioning maneuver. (*Id.* at 370-72.)

From May to September 2017, Bryant participated in physical therapy for her symptoms of dizziness and lightheadedness which she stated seemed worse with fatigue and at the end of her

6

work shift.  (*Id.* at 389-90, 412-15.)   During her therapy sessions, Bryant reported increased headaches and left arm numbness.[4]  (*Id.* at 412, 415.)

On August 22, 2017, a cervical x-ray revealed moderate to large osteophytes at C5 and C66, but no acute abnormalities. (*Id.* at 408-9, 434.)

On September 18, 2017, Bryant was referred to orthopedist Raymond Candage, M.D., for treatment of her cervical and left trapezius pain, which radiated into her left arm, and was associated with numbness in her left hand. (*Id.* at 428-30.) Examination notes show a normal gait and station, and Bryant was described as able to participate in an exercise program and do repetitive factory work with lifting 20 to 50 pounds. (*Id.* at 428-29.)  Examination revealed tenderness over her left trapezius and pain with range of motion testing. (*Id.* at 429.) Dr. Candage diagnosed cervical spinal stenosis, administered a left trapezius trigger point injections, and advised Bryant to initiate heat treatment, and call for an MRI if her condition did not improve in three weeks. (*Id.* at 430.)

On December 20, 2017, Bryant returned to see Dr. Candage and reported shooting pain in her left arm after she had some relief with the previous cortisone injection. (*Id.* at 431-33). Examination findings again included some trapezius tenderness on the left. (*Id.* at 432.)  Bryant received another trigger point injection and was scheduled for a cervical MRI to rule out neural impingement. (*Id.* at 432-33.)

On January 4, 2018, an MRI revealed small disc protrusions at C4-5, C5-6 and C6-7 with some central canal stenosis and neural foraminal stenosis without impingement. (*Id.* at 435.)

In January 2018, Bryant saw neurologist Ryan Drake, D.O., of NeuroCare Center, for treatment of her constant vertigo and near daily headaches, with sensitivity to light and sound. (*Id.*

---

[4]     The physical therapy notes are handwritten and difficult to decipher.

at 447-51.) She reported symptoms of dizziness, impaired sleep, gait disturbance, extremity numbness and joint pain. (Tr. 449.) Her physical examination had normal findings. (Tr. 449-50.) Dr. Drake diagnosed chronic migraine without aura, intractable, and other peripheral vertigo, bilateral, which he described as likely migrainous phenomenon. (Tr. 450.) She was prescribed Imitrex and Trokendi for her migraine symptoms. (Tr. 450-51.)

On February 21, 2018, at a follow-up visit at the NeuroCare Center for her migraine treatment, Bryant reported Imitrex caused dizziness, so she was taking only half the prescribed dose. (*Id.* at 442.) She had not taken Trokendi because she was concerned about side effects. (*Id.*) She reported that she experienced headaches less frequently, about three times a week, and had poor sleep due to vertigo, "pinched nerve," and headache, and some tinnitus. (*Id.* at 442-46.) A diagnostic study and vestibular evaluation were ordered due to continued migraines and ongoing vertigo despite previous vestibular therapy and treatment of migraines. (*Id.* at 444-45.)

On  February 27, 2018, an non-contrast MRI of Bryant's brain was negative, showing no abnormalities except for mucosal thickening in the right maxilary antrum. (*Id.* at 457-58.)

In March 2018, videonystagmography ("VNG") and electronystagmography ("ENG") results were normal. (*Id.* at 473.)

On April 2, 2018, Bryant returned to NeuroCare for migraine treatment, and reported she was "doing about the same," with migraines about three times a week triggered by light, sounds and dizziness.  (*Id.* at 458-62.)  She reported that Imirex "calms down the headache," but even a low dose caused increased dizziness; and she had not tried Trokendi because had concern over the side effects. (*Id.* at 458.)  She also reported tinnitus, not sleeping well due to her vertigo and a pinched nerve, and having memory problems. (*Id.*)  Physician's Assistant Emily Wright believed Bryant's

8

vertigo could be related to migraines.[5]  (*Id.* at 461.)  Bryant was prescribed Maxalt for migraines and nortriptyline to take at bedtime. (*Id.*)

On June 28, 2018, Bryant established care with Scott Yasinow, M.D., after moving to the Cleveland area, and sought referrals for specialists to evaluate her chronic conditions, including vertigo described as the "world spinning" and "being on a boat and going up and down," obesity, chronic back and knee pain, cervical impingement, palpitations. (*Id.* at 478-83.)  Dr. Yasinow noted she was tachycardic to 120, in the office, and clearly very nervous and anxious.  (*Id.* at 479.)  He ordered lab work and referred Bryant to several specialists including an ENT for vertigo, a pain management provider and a cardiologist.  (*Id.* at 481.)

On July 20, 2018, Cardiologist George Farah, M.D., examined Bryant for symptoms including occasional chest pain, dyspnea on mild to moderate exertion, occasional palpitations especially when anxious, lightheadedness on standing and dizziness/vertigo. (*Id.* at 674-76.)  An echocardiogram was normal.  (*Id.* at 677-79.)  Bryant was prescribed medications for atypical chest pain and dyspnea on exertion.  (*Id.* at 676.)

On August 2, 2018, Bryant consulted with pain management specialist Ankit Maheshwari, M.D., for treatment of her constant neck pain which radiated into her left shoulder blade, arm and wrist, was worsened by lateral rotation and lifting, which worsened with lateral rotation and lifting objects, and was associated with numbness.  (*Id.* at 531-34.)  She reported neck pain of 4/10 that day, and 10/10 a few times a week.  (*Id.* at 531.)  Examination results were normal except for some decreased sensation in her left lateral arm, lateral forearm and lateral wrist and tenderness over the

---

[5]     The treatment notes were reviewed and  approved by supervising doctor Charles Zollinger, M.D.  (Tr. 462.)

left shoulder blade. (*Id.* at 533.) Dr. Maheshwari concluded that Bryant's history, physical examination and imaging were suggestive of cervical radiculitis, referred her for physical therapy and increased her dosage of nortriptyline. (*Id.* at 533-34.)

On August 31, 2018, Bryant was evaluated by Lindsay Means, A.P.R.N.-C.N.P., of University Hospital's otolaryngology department, for her ongoing vertiginous dizziness. (*Id.* at 551-55.) Bryant described her dizziness as a sudden onset of continuous spinning which then became a constant sensation of feeling waves, with lightheadedness and exacerbated by heat and with looking up and down. (*Id.* at 551.) She also reported headaches, phono- and photophobia, pressure induced symptoms with laughing, intermittent bilateral fullness and tinnitus and double, blurred vision. (*Id.*) Romberg testing was unsteady, as Bryant leaned to the left, but she was able to compensate. (*Id.* at 554.) An audiogram and tympangograms were normal bilaterally. (*Id.* at 548-50, 554, 563.) Nurse Means recommended further testing to evaluate for canal dehiscence and did not believe it was likely that Bryant had a peripheral vestibular disorder but more likely her symptoms were migraine variant. (*Id.* at 554.)

On September 26, 2018, Vestibular Evoked Myogenic Potential ("VEMP") testing revealed a reduced threshold in Bryant's left ear suggestive of semicircular canal dehiscence. (*Id.* at 560-62, 564-66.) The amplitude asymmetry ratio of 1% was not significant. (*Id.* at 561.)

On September 29, 2018, Bryant sought treatment from retinal specialist Joseph M. Coney, M.D., for her reports of blurred, double vision and migraines. (*Id.* at 536-38.) Dr. Coney noted she had retinal detachment repair and resolved retinal thickening consistent with macular edema but, otherwise, found no visual abnormalities. (*Id.* at 537.)

10

In October 11, 2018, Bryant consulted neurologist Robert Richardson, M.D., for her migraines and vertigo.  (*Id.* at 541-45.)  She reported that, although the vertigo stabilized after its initial onset, she always has it and it fluctuates in severity. (*Id.* at 541.)  Medications and vestibular therapy were not helpful. (*Id.*)  Her headache frequency was now about 10 days per month with each lasting from several minutes to an entire day.  (*Id.*)  Her physical examination results were normal aside from reduced pin sensation on the left lateral upper arm. (*Id.* at 544.)  Dr. Richardson believed Bryant required abortive management for her migraines and prescribed naratriptan and prednisone.  (*Id.* at 544-45.)

On October 22, 2018, Bryant returned to Nurse Means and reported no change in her symptoms of dizziness.  (*Id.* at 556-59.)  Bryant had recently begun taking medication for migraines but it had not helped her dizziness.  (*Id.* at 556.)   After reviewing the VEMP test results, Nurse Means concluded that Bryant's vertigo was "likely secondary to left semicircular canal dehiscence," and recommended additional testing.  (*Id.* at 559.)

On October 29, 2018, Dr. Yasinow reported that Bryant's many chronic issues (including vertigo, obesity, pain and palpitations) still remained poorly controlled but with some mild improvement after establishing care with multiple specialists.  (*Id.* at 494-98.)

In November 2018, Bryant completed a nine-session course of physical therapy aimed at treating her neck pain and reduced ability to use her left arm and hand for functional tasks.  (*Id.* at 571-88, 593-610.)  The physical therapist reported that Bryant generally presented with left arm and neck pain while at rest and had recurrent symptoms with cervical spine motion and use of her left arm with daily tasks.  (*Id.* at 607, 609.)  Functional testing results revealed Bryant's ongoing

11

difficulty with use of her left arm and the physical therapist questioned further improvement in her condition as her progress had plateaued.  (*Id.* at 609.)

On December 6, 2018, Dr. Maheshwari examined Bryant for follow-up regarding the neck pain which radiated into her left arm. (*Id.* at 656-59.)  Physical therapy and medications improved her pain but she still she still reported shooting pain from her neck into her left shoulder and arm with lifting over five pounds as well as numbness in her left arm.  (*Id.* at 656.) She exhibited tenderness on palpation of her left shoulder. (Tr. 658.) Dr. Maheshwari recommended a cervical epidural injection.  (*Id.* at 658, 662-63.)

On December 19, 2018, Bryant underwent videonystagmography ("VNG") testing which revealed abnormal findings. (*Id.* at 710-12, 722-26.)  Bithermal caloric testing showed bilateral caloric weakness/hypofunction. (*Id.* at 711-12.)

In January 2019, Bryant followed-up with Dr. Richardson, and reported headaches one to two times per week, positional dizziness/lightheadedness on a daily basis, and some positional vertigo.  (*Id.* at 695-98.)  Dr. Richardson's impressions were chronic positional peripheral vertigo and migraine without aura and he advised Bryant to continue home exercises for positional vertigo and use of medications for headache prophylaxis.  (*Id.* at 698.)

In January 2019, Bryant returned to Dr. Maheshwari for the recommended cervical epidural injection, and reported some improvement in her radiating arm pain but remained symptomatic with moderate to severe left-sided neck pain.  (*Id.* at 653-55.)  Dr. Maheshwari observed grossly normal gait, discrete tenderness to palpation of the left C2, 3, and 4 facet joints and discrete trigger pain in the left trapezius muscle and recommended proceeding with a diagnostic left cervical medial branch block with further consideration of radiofrequency ablation treatment.  (*Id.* at 655.)

On April 3, 2019, Dr. Maheshwari administered left C2, C3 and C4 medial branch blocks. (*Id.* at 735-36, 750.)

On April 17, 2019, Bryant began vestibular therapy for vertigo. (*Id.* at 703-9.)  The physical therapist noted that VNG testing suggested mild vestibular loss and believed the objective testing did not suggest a peripheral issue causing Bryant's dizzy spells with symptoms aggravated by prolonged standing and heat.  (*Id.* at 706.)  The goals of therapy were to improve Bryant's neck and left upper extremity pain, dizziness, and blurred vision; and increase her reading and computer tolerance, standing, walking, and driving tolerance.  (*Id.* at 707.)

**C.      State Agency Reports**

**1.      Mental Impairments**

On August 4, 2018, state agency psychologist Deryck Richardson, Ph.D., reviewed Bryant's claim at the reconsideration level. (Tr. 117-19, 135-37). He opined Bryant had the following limitations to her mental residual function capacity ("RFC"):

- moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (i.e., limited to multi-step and more complex tasks in a static setting without the need for fast pace or high production quotas);

- moderately limited in her ability to interact with the general public and accept instructions and respond appropriately to criticism from supervisors (i.e., limited to occasional interactions with coworkers, supervisors and the general public); and

- moderately limited in her ability to respond appropriately to changes in the work setting (i.e., reduced stress tolerance restricts her to settings where major changes are not frequent, she is able to adapt to minor changes).

(*Id.*)

13

### 2. Physical Impairments

On April 18, 2018, state agency physician Michael Hallet, M.D., reviewed Bryant's file and opined that Bryant had the following limitations to her physical RFC:

- lift 20 pounds occasionally and 10 pounds frequently;

- stand and/or walk and sit for about six hours in an eight-hour workday;

- occasionally climb ramps/stairs and crawl;

- frequently stoop, kneel and crouch;

- never climb ladders/ropes/scaffolds; and

- should avoid all exposure to hazards (machinery, heights, etc.)

(*Id.* at 86- 88, 98-100.)  On July 3, 2018, state agency physician Gerald Klyop, M.D., reviewed the record and affirmed Dr. Hallet's assessment. (*Id.* at 115-17, 133-35.)

### D. Hearing Testimony

During the July 12, 2019 hearing, Bryant testified to the following:

- She lives in Maple Heights, with her mother and her 12-year-old daughter.  (Tr. 44.)

- She is 5 foot 3 inches tall, and weighs 261 pounds.  She has gained weight because she is not able to be as active as she used to because of her vertigo.  (*Id.*)

- She is right-handed. (*Id.*)

- She is single and not dating.  (*Id.*)

- She has a driver's license and sometimes drives her daughter to her bus stop, when there's no other way to get her there, because her daughter has autism and can't walk by herself.  She also drives about twice a week to an appointment or to pick up medication.  She never drives more than 20 minutes, because she can't drive far distances.  (*Id.* at 44-5.)

- She attended some college classes.   (*Id.* at 45.)

14

- She last worked in the beginning of January 2018.  She had taken the month of December off, and tried to return to work at Sterilite, but was unable to do it.  (*Id.* at 45-6.)

- She worked at Sterilite from 2015 to 2017.  Prior to that, She worked at Newell Rubbermaid from 2005 to 2009.  In 2004, she worked through Spherion, a temp service.  (*Id.* at 46-7.)

- At Sterilite, she worked as an inspector packer, a fast-paced job that involved grabbing molded plastic items off an assembly line, boxing them, and lifting boxes that weighed up to 50 pounds to put them on pallets.  She was on her feet all day except for a 20 minute lunch and two 10 minute breaks.  (*Id.* at 48.)

- She did essentially the same work at Newell brands, except the products were Graco children's products.  (*Id.* at 49.)

- The Spherion temp service placed her at Chino products, where she inspected PC boards.  That job was mostly seated, and didn't require her to carry anything beside the boards, which weighed 10 pounds or less.  (*Id.* at 49-50.)

- The main reason she cannot work is her vertigo, which causes a rocking on a boat feeling, spinning, lightheadedness, and trouble focusing.  She can't look at a tv or a book, because her eyes will start hurting, which will trigger a migraine.  The vertigo doesn't go away, even when she sits down, but it varies in intensity throughout the day.  (*Id.* at 50-1.)

- She also has neck pain and soreness on and off during the day, which extends through her left shoulder and down to her elbow.  She rated the pain a 7 on a scale of 1 to 10, with the medication she takes daily.  Without medication, it would be worse.  (*Id.* at 52.)

- She can sit throughout the day.  She can only stand for an hour at most on a typical day.  She doesn't know how far she can walk, but she has to walk very slowly.  (*Id.* at 54.)

- At the grocery store, she get a cart to guide her.  The most she can walk is 20 minutes without a shopping cart.  (*Id.* at 55.)

- With her left arm, she can lift no more than 5 pounds.  With her right arm, she can lift 50 pounds.  (*Id.*)

- She uses an alarm on her phone to remind herself to take her medication.  She has no trouble remembering to bathe and brush her teeth.  (*Id.* at 56.)

15

- She doesn't see anyone other than her mother and her daughter.  She spends her days sitting or laying down, listening to the tv or something on her phone at a low volume, because loud noises hurt her ears.  Sometimes she will peek up at the tv for a bit, but then she has to look down to give her eyes a break.  (*Id*.)

- When she tries to focus on the tv too long, she gets double vision or her vision gets blurry.  (*Id.* at 57.)

- The medication she takes makes her sleepy, so she naps during the day and she has trouble sleeping at night.  It also makes her dizzy and constipated.  (*Id.* at 58.)

- Her symptoms haven't changed much since December 2017.  (*Id*.)

- Her migraines are triggered by the sun rising and setting, by tiredness, and by focusing on things such as trying to read or watching the tv.  Her vertigo is triggered if she hold her head up or down too far, or when she is hot.  Her left arm pain is triggered by any pressure on her left shoulder area, such as a brassiere strap or a seatbelt.  (*Id.* at 59-60.)

- She has found that keeping calm and meditating helps her migraines, as well as getting into a dark room.  Her vertigo lessens when she sits down.  Sometimes she takes ibuprofen for her neck and arm pain, although her first neurologist warned her not to.  (*Id.* at 60.)

- The chores she does around the house include washing dishes if she is able, but she has to avoid repetitive movement, because that hurts her left shoulder.  She can dust taller things that don't require her to bend down, and wipe out the sink.  Her mother and daughter do the other chores.  (Tr. 62-3.)

- Her migraine headaches occur between two and three times a week, but lately have been every day.  They can last from an hour to half a day.  She has a half-day migraine at least once a week, and has to seclude herself in a dark room.  (Tr. 64.)

- When her vertigo is at its worse, she has to sit down or brace herself, because she also gets lightheaded.  She has a long period of a spinning feeling about once a month, which can last for up to 8 hours. Her average episode of intense vertigo is 2 to 3 hours in length. What helps is sitting down and holding her head level.  (*Id.* at 66-7.)

- She sees a counselor every two weeks for her mental health, and also sees a psychiatrist once every three months.  She has anxiety and depression, which is linked to having to stop working.  The anxiety limits her ability to work because her heart races and causes pain, and she has to sit down to relax.  The depression limits her ability to work because her mood is always down.  (*Id.* at 70-1.)

16

The VE testified Bryant had past work as an inspector-packager and electronics inspector. (*Id.* at 72.)  The ALJ then posed the following hypothetical question:

> assume a hypothetical individual of the claimant's age and education and with the past two positions you've identified.  Further assume that the hypothetical individual is limited as follows to light.  Occasional climbing of ramps and stairs.  Never to climb ladders, ropes, or scaffolds.  Frequently stoop, kneel, crouch.  Occasionally crawl.  Never to be exposed to unprotected heights, moving mechanical parts or operate a motor vehicle.  Limited to performing simple, routine and repetitive tasks, but not at a production rate pace, i.e. assembly line work.  Limited to simple work related decisions and using her judgment in dealing with changes in the work setting.  Able to occasionally interact with supervisors, coworkers and the public.  First could that hypothetical individual perform either of the past positions that you've identified?

(*Id.* at 73.)

The VE testified the hypothetical individual would not be able to perform Bryant's past work as an inspector-packager and electronics inspector.  (*Id*.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as a marker, checker or garment sorter.  (*Id.* at 73-4.)

The ALJ next amended the hypothetical by adding the limitations that the hypothetical individual could occasionally balance, stoop, kneel, and crouch; and frequently be exposed to humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme heat and extreme cold.  (*Id.* at 74.)  The VE testified that the jobs identified in response to the first hypothetical remained available.  (*Id*.)

The ALJ offered a third hypothetical, combining all the limitations in the first and second hypotheticals with the additional limitation to sedentary work.  (*Id*.)  The VE testified that the hypothetical individual would be able to perform representative jobs in the economy, such as ink printer, label pinker, and table worker.  (*Id.* at 74-5.)

17

The ALJ offered a fourth hypothetical, adding the limitations of occasional reaching overhead with the left arm, frequent reaching in all other directions with the left arm, frequent left hand controls, frequent left handling, frequent left fingering. (*Id.* at 75.)  The VE testified that the jobs identified in response to the third hypothetical would still be available.  (*Id.* at 75-6.)

The ALJ offered a fifth hypothetical modifying the limitations in the fourth hypothetical to occasional reaching in all directions with the left and occasional handling and fingering with the left.  (Tr. 76.)  The VE testified no jobs would be available.  (*Id.*)

Finally, the VE testified that an individual who would be off task 20% of an eight-hour workday or absent from work two days a month would be unable to sustain competitive work.  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 & 416.1201.

18

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Bryant was insured on her alleged disability onset date, April 8, 2017, and remained insured through December 31, 2017, her date last insured ("DLI.")  (Tr. 17.)  Therefore, in order to be entitled to POD and DIB, Bryant must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an

19

entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*,

381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act
through December 31, 2017.

2.    The claimant has not engaged in substantial gainful activity since December
1, 2017, the amended alleged onset date.

3.    The claimant has the following severe impairments: Osteophyte formation
at C5 and C6; Small hiatal hernia; Migraine; Vertigo; Asthma; Obesity;
Depression; Anxiety; and Personality disorder.

4.    The claimant does not have an impairment or combination of impairments
that meets or medically equals the severity of one of the listed impairments
in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform sedentary work as
defined in 20 CFR 404.1567(a) and 416.927(a) except the claimant can
occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds;
occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to
unprotected heights, moving mechanical parts, or operate a motor vehicle;
frequently be exposed to humidity and wetness, dust, odors, fumes, and
pulmonary irritants, extreme cold, and extreme heat; limited to performing
simple, routine, and repetitive tasks, but not at a production rate pace (i.e.,
assembly line work); limited to simple work related decisions in using her
judgment and dealing with changes in the work setting; and able to
occasionally interact with supervisors, coworkers, and the public.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born in **, 1972  and was 37 years old, which is defined
as a younger individual age 18-44, on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate
in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2017, through the date of this decision.

(Tr. 17-25) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).   Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are

not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

22

*McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Bryant asserts that the ALJ erred when he concluded that she retained the RFC to perform jobs which exist in significant numbers in the national economy because he failed to support this determination with substantial evidence.  (Doc. No. 11 at 15, 17.)  She argues that the ALJ's RFC determination does not adequately account for her symptoms and the limitations imposed by her severe impairments, particularly her vertigo with lightheadedness, migraines, and cervical condition affecting her left arm and hand, and that greater limitations are supported by the record.  (*Id*. at 15-16.)  She asserts that the ALJ failed to discuss the treatment notes of any of her treating neurologists, who treated her for her migraine headaches, and failed to discuss the evidence surrounding treatment for her cervical impairment with any specificity.  (*Id.* at 18.)

The Commissioner responds that the ALJ properly considered the medical evidence as a whole and additional statutory factors in assessing the Bryant's subjective claims, and his conclusions are entitled to great weight and deference.  (Doc. No. 12 at 7.)  He notes that ALJ is not required to address every piece of evidence in his decision. (*Id*. at 11.)  He argues the RFC determination addressed many of Bryant's complaints, and properly assessed limitations which the ALJ determined were supported by the record evidence.  (*Id*.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).  An ALJ

23

"will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* 20 C.F.R. § 416.946(C); S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).

It is well established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, No. 16  5175, 2016 WL 4150919, at *6 (6th Cir. Aug. 5, 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany  Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error

where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474 at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11 CV 2313, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Here, at step two, the ALJ determined Bryant suffered from the severe impairments of osteophyte formation at C5 and C6; small hiatal hernia; migraine; vertigo; asthma; obesity; depression; anxiety; and personality disorder.  (Tr. 17.) Bryant does not dispute the ALJ's step three determination that her impairments did not meet or equal the requirements of a Listing.  (*Id.* at 18-19.)  The ALJ did not discuss her severe impairment of migraine headaches at this step.  In assessing her severe impairments related to her cervical spine, the ALJ explained:

> The claimant's degenerative disc disease does not meet Listing 1.04 because the record does not demonstrate compromise of a nerve root (including the cauda equina) or the spinal cord with additional findings of: A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising; or B) spinal arachnoiditis; or C) lumbar spinal stenosis resulting in pseudoclaudication.

(Tr. 18.)

Next, the ALJ turned to evaluating the impact of Bryant's symptoms on her functioning at step four.  He assessed her physical symptoms in combination with her vertigo as follows:

The claimant testified that she is unable to work because of vertigo and lightheadedness. She reported that she experiences vertigo throughout the day. The claimant also claimed that her neck is in pain on/off throughout the day and described it as a 7-8 on the pain scale with medication, and without medication, she is a nine on the scale. Since the alleged onset date, she advised that her impairments have remained the same. The claimant's conditions are aggravated by sunrise/sunset, tiredness, holding her head up/down, and heat and helped with laying down. In terms of physical abilities, she testified that she is able to sit all day, stand 1 hour, walk 20 minutes, and lift less than 5 pounds with her left arm and 50 pounds with her right.

* * * *

As for the claimant's vertigo, most testing and imaging was generally unremarkable.  A hearing evaluation was normal in August of 2018 (Ex. 19F/4, 9). She did have an abnormal VNG exam. Bithermal caloric testing yielded a bilateral caloric weakness/hypofunction. Ocular motility testing to visually guided signals was normal. Position and positioning testing (Dix-Hallpike and head roll test) were normal. Headshake testing was normal in December of 2018 (Ex. 31F/3). The claimant's VMP threshold was reduced in the left ear which is suggestive of semicircular canal dehiscence in the left ear. The VEMP threshold in the right ear was normal. The amplitude asymmetry ratio of 1% was not significant in September of 2018 (Ex. 19F/16).

An MRI of the brain from February of 2018 showed a negative noncontrast view of the brain, with no restricted diffusion or other evidence of an acute infarct or intracranial hemorrhage. (Ex. 10F/2). A normal ENG was recorded in March of 2018 (Ex. 11F/16). A CT of the temporal bones was unremarkable in November of 2018 (Ex. 31F/5).

Objective imaging notes osteophyte formation at C5 and C6 in June of 2017 (Ex. 5F/18). The claimant received a cervical epidural injection in January of 2019 (Ex. 26F/3) and left C2, C3, and C4 medial branch block in April of 2019 (Ex. 34F/1). She treated with physical therapy on September 6, 2018 (Ex. 20F/9), September 13 (Ex. 20F/11), October 1 (Ex. 20F/12), October 3 (Ex. 20F/13), October 9 (Ex. 20F/14), October 10 (Ex. 20F/15), October 15 (Ex. 20F/16), October 17 (Ex. 20F/17), October 24 (Ex. 20F/18), and October 31 (Ex. 20F/19). The claimant was discharged on November 8, 2018. It was noted that her progress plateaued, and that further improvement was questionable. (Ex. 20F/21).

In April of 2019, physical therapy noted that the claimant was without signs of migraines or cervical pain causing her symptoms and her VNG suggests very mild vestibular loss that is not clinically relevant. Further, objective testing in the clinic did not suggest a peripheral issue is causing her dizzy spells. She also has

26

unrelated symptoms to the vestibular system (prolonged standing and heat cause her lightheadedness and dizziness (Ex. 30F/7-8). Prior to her onset date, the claimant had a mascular [sic] detachment and history of retinoschisis. The claimant had a 25 gauge trans para plana vitrectomy, PFO, endolase photocoagulation, and gas fluid exchange with 20% SP6 in the right eye on April 7, 2012 (Ex. 1F/11).

The claimant underwent a total laparoscopic hysterectomy, bilateral salpingectomy, and cystoscopy on February 18, 2019 with biopsy (Ex. 26F/5-7). An earlier ultrasound of the transabdominal with transvaginal from August of 2018, showed a 2.4 cm submucosal leiomyoma in the anterior body. Endometrium was normal thickness. Ovaries were normal size. (14F/9). The claimant had a coronary artery calcium score of 0 and small hiatal hernia in July of 2018 (Ex. 14F/10). His [sic] echo was normal in August of 2018 (Ex. 27F/9).

An x-ray of the chest from May of 2017 noted that the heart is normal in size. No vascular congestion, pneumothorax, focal consolidation, or pleural effusion was seen. No acute process was noted. (Ex. 3F/12).

* * * *

In January of 2019, it was noted that the claimant's neck and shoulder pain markedly improved post injection, but axial left sided neck pain was unchanged. She had a grossly normal gait, discrete tenderness to palpation of left C2, 3, 4 facet joints, discrete trigger point in left trapezius muscle, CN 2-12 intact, and 5/5 strength in all extremities. She had normal reflexes, intact sensation, normal provocative tests, and was alert and oriented. She had a normal mood and affect. (Ex. 24F/5-9). It was noted in February of 2019 that the claimant was well groomed, friendly, had good eye contact, appropriate affect, and normal speech/language (Ex. 24F/11). It was also noted that the claimant had mild improvement in her anxiety and depression (Ex. 32F/2). She had an unremarkable gait, with no edema in the extremities (Ex. 32F/4).

(Tr. 20-22.)

As Bryant notes, the ALJ did not address or reference the treatment records of neurologists Dr. Drake and Dr. Richardson, which are in the record at 8F, 18F, 29F (Tr. 447-51, 458, 541-45, 691-98.) This omission is significant because his discussion of Bryant's disabling symptoms doesn't discuss her migraine headaches at all, despite the ALJ's earlier determination that they are a severe

impairment.[6]  SSR 96-8p requires that, "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p (S.S.A.), 1996 WL 374184.  Here, the ALJ failed to consider the limitations and restrictions imposed by an impairment he identified as severe.  It is not this Court's role to weigh the evidence and make a determination regarding whether Bryant's migraine headaches, alone or in combination with her other impairments, are disabling.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence). Yet, in the absence of any discussion of the record evidence relating to treatment of Bryant's migraine headaches, this Court cannot provide meaningful review of the ALJ's decision. *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").  As other Courts have explained, "[w]ithout some explanation in the record as to how plaintiff can suffer from a severe impairment, which by definition must have more than a minimal effect on plaintiff's ability to work and why such severe impairment would not have had any limitation on plaintiff's ability to . . . [fulfill the necessary functions of] the jobs identified by the vocational expert, the decision cannot stand." *Winston v. Berryhill*, No. 3:16-CV-419-BH, 2017 WL 1196861, at *14 (N.D. Tex. Mar. 31, 2017), *aff'd*, 755 F. App'x 395 (5th Cir. 2018); quoting

---

[6]     In his discussion of Bryant's vertigo, the ALJ does mention that a single physical therapy note states that the therapist observed Bryant to be  "without signs of migraines or cervical pain causing her symptoms," in April 2019.  (Tr. 21.) However, he omits any discussion of the many medical records suggesting a link between her vertigo and migraines or cervical condition.  (Tr. 444-45, 449-50, 461, 554, 695-98.)

*Martinez v. Astrue*, No. 2:10-CV-0102, 2011 WL 4128837, at *5-6 (N.D. Tex. Sept. 15, 2011), *adopted by* 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011).

The record shows that at least two neurological treatment providers thought that Bryant's vertigo might be related to her migraines. (Tr. 461, 698.)  They were severe enough to require abortive treatment with naratriptan and prednisone. (*Id.* at 544-45.)  The ALJ acknowledged that substantial evidence supported the identification of migraine headaches as a severe impairment,[7] and he therefore had the obligation to include discussion of at least some of the relevant treatment records in his decision.  Further, it is not clear from the decision that the ALJ accommodated the severe impairment of migraine headaches in his RFC determination, particularly because his lack of analysis of the issue makes it impossible to infer any such connection.  The undersigned therefore recommends that this case be remanded to allow the ALJ to consider limitations and restrictions imposed by all of Bryant's impairments, including her migraine headaches, as required by SSR 96-8p.

Bryant also asserts that the ALJ erred by failing to discuss the evidence surrounding Ms. Bryant's treatment for her cervical impairment with any specificity. (Doc. No. 11 at 19.)  Although she cites evidence which the ALJ did not discuss, the explanation of his decision does include recitation of a significant amount of evidence relating to her cervical spine impairment.  As explained supra, an ALJ need not discuss every piece of evidence in the record.  *Thacker,* 99 F. App'x at 665.  Therefore, this assignment of error does not provide grounds for remand.  However, because this case should be remanded on other grounds, the undersigned recommends the ALJ take

---

[7]      The Court notes that the ALJ did not detail the evidence that supported his determination of severe impairments, and therefore no guidance can be gleaned from this section of his decision.

the opportunity of remand to discuss the evidence surrounding Bryant's treatment for her cervical impairment with greater specificity.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED to allow the ALJ to consider limitations and restrictions imposed by all of Bryant's impairments, including her migraine headaches, as required by SSR 96-8p.  The ALJ should also take the opportunity of remand to discuss the evidence surrounding Bryant's treatment for her cervical impairment with greater specificity.

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: April 7, 2021

30